KYLE SCHUMACHER (BAR #121887)
kyle@schumacherlane.com
**SCHUMACHER LANE PLLC**
P.O. Box 558
Spring Branch, TX 78070
503-482-8137 ph
210-783-1383 fax

Attorneys for Plaintiffs
Jacob Carpenter and Kirsten Carpenter

UNITED STATES DISTRICT COURT
DISTRICT OF OREGON – PORTLAND DIVISION

| | |
|---|---|
| Jacob Carpenter and Kirsten Carpenter,<br><br>Plaintiffs,<br><br>v.<br><br>Capital One, National Association; and DOES 1 through 100 inclusive,<br><br>Defendants. | CASE NO. 3:23-cv-153<br><br>PLAINTIFFS' COMPLAINT FOR DAMAGES:<br><br>1. Violation of Fair Credit Reporting Act |

COMES NOW Plaintiffs **JACOB CARPENTER** ("Mr. Carpenter") **AND KIRSTEN CARPENTER** ("Mrs. Carpenter") (collectively, "Plaintiffs"), individuals, based on information and belief, to allege as follows:

## INTRODUCTION

1. This case arises under the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681s-2(b). Plaintiffs seek redress for the unlawful and deceptive practices committed by the Defendants in connection with their inaccurate, misleading, or incomplete reporting of Plaintiffs' debt reaffirmed in their Chapter 7 bankruptcy.

2. Here, Defendant Capital One, National Association ("Capital One") is inaccurately reporting Mr. Carpenter's account to Equifax Information Services, LLC ("Equifax") with inaccurate and incomplete payment history and reporting that the account was discharged in bankruptcy.

3. Defendant Capital One is inaccurately reporting Mrs. Carpenter's account to Equifax with inaccurate and incomplete payment history and reporting that the account was discharged in bankruptcy.

4. The United States Congress has found the banking system is dependent upon fair and accurate credit reporting. Inaccurate credit reports directly impair the efficiency of the banking system and unfair credit reporting methods undermine the public confidence that is essential to the continued functioning of the banking system.

5. A pervasive and fundamental misunderstanding presently thrives in the United States regarding the long-term impact that filing a consumer bankruptcy has on the consumer's creditworthiness. Specifically, consumers tend to believe that since a bankruptcy can be reported on their credit report for ten (10) years, their creditworthiness will be ruined for the same length of time. This is not true.

6. The *majority* of consumer debtors file a consumer bankruptcy to *raise* their FICO Score and remedy their poor creditworthiness.

7. In fact, it is possible for consumer debtors to obtain a 700 FICO Score as soon as twelve (12) months from filing a consumer bankruptcy (Chapter 7 or Chapter 13).

8. Creditors and lending institutions are aware of the misconception that filing a consumer bankruptcy destroys the consumer's creditworthiness of ten (10) years; however, to perpetuate this bankruptcy myth, creditors intentionally and routinely ignore industry standards for accurately reporting bankruptcies, as well as the debts included in those bankruptcies, to keep consumers' credit scores low and their interest rates high.

9. Creditors know that deviating from recognized credit reporting standards will make it difficult for consumers to raise their credit scores and improve their creditworthiness.

10. This was not the intent of Congress when it enacted the Fair Credit Reporting Act and the Bankruptcy Abuse Prevention and Consumer Protection Act.

**JURISDICTION & VENUE**

11. Plaintiffs re-allege and incorporate the allegations in each and every paragraph above by reference as if fully stated herein.

12. This Court has jurisdiction under 28 U.S.C. §§ 1331, 1337, 1367, and 15 U.S.C. § 1681.

13. This venue is proper pursuant to 28 U.S.C. § 1391(b)(1).

14. Plaintiffs allege that, for purposes of establishing residency under 28 U.S.C. § 1391(b)(1), each named Defendant conducts sufficient business within the forum state and this Court has personal jurisdiction over Defendants under 28 U.S.C. §§ 1391(c)(2) and 1391(d).

## GENERAL ALLEGATIONS

15. Plaintiffs allege that the Capital One account covers a motor vehicle that was reaffirmed in their bankruptcy. Subsequent to the reaffirmation, Plaintiffs made all payments and have continued to do so until present.

16. Plaintiffs allege that Capital One is reporting the account with incomplete and inaccurate payment history even though they made all payments since the reaffirmation up until the account was paid in full in November 2021.

17. Plaintiffs allege Capital One is incorrectly reporting the debt as discharged in bankruptcy. Capital One is not reporting the debt as reaffirmed.

18. Plaintiffs allege that if a data furnisher decides to report an account, the FCRA requires complete and accurate reporting; therefore, a data furnisher cannot pick and choose which portions of the account to report. If a data furnisher reports an account, then it should report all portions of that account in a manner which complies with the maximum accuracy and completeness standard of the FCRA.

19. Plaintiffs allege that each and every Defendant is familiar with the FCRA requirements and credit reporting industry standards, and subscribes thereto.

20. Plaintiffs allege that each and every Defendant understands that deviation from the FCRA requirements or credit reporting industry standards can, and often does, result in the denial of credit, higher interest rates, and prompts a negative inference that would not be drawn if the data were reported in accordance with the recognized standards.

21. Plaintiffs allege that all of Defendants' actions alleged herein were committed knowingly, intentionally, and in reckless disregard of the unambiguous meaning of the FCRA, regulatory guidelines on accurate reporting, and credit reporting industry standards to purposefully undermine their ability to repair their respective Credit Scores.

22. In the alternative, Plaintiffs allege that each and every Defendants' actions were the result of negligent policies, procedures, and an objectively unreasonable interpretation of the FCRA, all which inevitably led to inaccurate, misleading, or incomplete credit reporting.

## FACTUAL BACKGROUND

23. Plaintiffs re-allege and incorporate the allegations in each and every paragraph above by reference as if fully stated herein.

**A.     FICO, Inc.**

24. FICO is a leading analytics software company with its principal headquarters in San Jose, California. FICO has over 130 patents related to their analytics and decision management technology and regularly uses mathematical algorithms to predict consumer behavior, including credit risk.

25. The FICO Score has become the standard measure of consumer credit risk in the United States and is used in ninety percent (90%) of lending decisions.[1]

26. A FICO Score consists of a three-digit number summarizing a consumer's credit risk or likelihood to repay a loan. FICO periodically updates its scoring models resulting in multiple FICO Score versions.

27. Base FICO Scores range from 300 to 850, while industry specific FICO Scores range from 250-900. A higher FICO Score demonstrates lower credit risk or less likelihood of default.

28. Different lenders use different versions of FICO Scores when evaluating a consumer's creditworthiness.

29. There are twenty-eight (28) FICO Scores that are commonly used by lenders.

30. A consumer's FICO Score is calculated based solely on information in consumer credit reports maintained at credit reporting agencies ("CRAs").

31. The three largest CRAs are Experian Information Solutions, Inc. ("Experian"); Equifax Information Services, LLC ("Equifax"); and TransUnion, LLC ("TransUnion").

32. FICO does not control what information is provided on a consumer's credit report. Instead, the scoring models, or algorithms, are based on the premise that the information provided by the CRAs is accurate and complies with both the FCRA requirements and credit reporting industry standards.

---

[1] While there are other credit scoring models, it is well established that FICO Score is by far the most widely used by lenders, employers, insurance companies, and lessors. See https://www.myfico.com (a website created and operated by Fair Isaac Corporation ("FICO"), "the company that invented the FICO credit score").

33. There are five (5) key factors that a FICO Score considers: (1) payment history; (2) amount of debt; (3) length of credit history; (4) new credit; and (5) credit mix.

34. Each of the five (5) factors is weighted differently by FICO.

35. In other words, thirty-five percent (35%) of a consumer's FICO Score relates to payment history, thirty percent (30%) relates to the amount of debt, fifteen percent (15%) relates to the length of credit history, ten percent (10%) relates to new credit, and the final ten percent (10%) relates to a consumer's credit mix, which is the different types of debts reported.

36. Payment history refers to whether a consumer has paid their bills in the past, on time, late, or missed payments. The more severe, recent, or frequent the late payment information, the greater the impact on a FICO Score. Public record items, such as bankruptcy, foreclosure, judgments, and wage garnishments are also considered part of a consumer's payment history.

37. In factoring the severity of delinquent payments, a FICO Score considers how late the payment continues to be, how much is owed, how recently this occurred, and how many delinquent accounts exist.

38. Once a delinquent account has been remedied, the longer the account stays current the more a consumer's FICO Score should increase.

39. FICO Scores are entirely dependent upon information provided by data furnishers ("DFs"), such as banks and other financial institutions, to CRAs.

40. The FICO scoring formula treats both Chapter 7 and Chapter 13 Bankruptcies similarly in terms of their impact on one's FICO Score. Specifically, both Chapters have the same level of severity with respect to their FICO Score and FICO uses the filing date, under both Chapters, to determine how long ago the bankruptcy took place.

41. A FICO Score is a summary of your credit report. In simple terms, the FICO Score is calculated by taking the five (5) factors (payment history, amount of debt, length of credit history, new credit, and credit mix) for each account in a credit report and calculating a three digit number for lenders to review. "When you apply for credit, lenders need a fast and consistent way to decide whether or not to loan you money." *See* https://www.myfico.com/credit-education/what-is-a-fico-score. If a lender or employer did look past the FICO Score into a consumer's reports, chances are they either do not understand the tradeline meanings themselves, or, if they do and realize something appears incorrect, they are incapable of recalculating the complex mathematical algorithms in a FICO Score to take the found error into consideration. Therefore, most lenders and

employers do not review individual accounts, just a consumer's FICO Score (or average of FICO Scores) in order to make "quicker decisions". *See id*.

42. Some lenders also use internal scoring models. In these instances, the lenders attempt to produce their own "FICO Score" based upon their internal credit scorecard models. These models are, similar to FICO, based upon algorithms, business rules, codes, etc. and take information reported in the credit reports and assign weights to them in order to assess risk and make determinations as to consumer's creditworthiness. FICO Scores and the scores based off internal models being collectively referred to as "Credit Score".

**B.   e-OSCAR**

43. e-OSCAR is the web-based system developed by Experian, Equifax, TransUnion, and Innovis that enables DFs and CRAs to create and respond to consumer credit disputes.

44. When a consumer sends a dispute letter to a CRA, the CRA then sends an automated credit dispute verification ("ACDV") via e-OSCAR to the appropriate DF.

45. The ACDV contains codes next to certain data fields associated with a credit file.

46. When a data furnisher reports on a consumer's account as part of its regular reporting, it sends a regular monthly transmission to each CRA.

47. When a data furnisher reports on a consumer's account outside of its regular monthly transmission, it sends an automated universal dataform ("AUD") to each CRA.

48. For clarification, an AUD or other regular transmission is sent when the data furnisher initiates reporting on a consumer's account (e.g., opening an account, updating the account each month, closing an account, etc.), whereas an ACDV is how a data furnisher receives a dispute request from the CRAs and how it updates reporting back to the CRAs after its investigation of the matter.

**C.   Bankruptcy Credit Reporting Industry Standards & Consumer Information Indicator**

49. When a consumer files bankruptcy, certain credit reporting industry standards exist.

50. Certain data is regularly expected and calculated by FICO when determining a consumer's creditworthiness.

51. The Consumer Information Indicator ("CII") is a critical field that indicates a special condition that applies to a specific consumer.

52. It is the credit reporting industry standard to report a very specific CII upon the filing of a consumer bankruptcy.

53. The CII "R" denotes reaffirmation of a debt. In addition, completely reaffirmed debts should report appropriate Account Status and account information as it applies going forward.

54. The CII field is a critical field for consumers as it directly relates and impacts a consumer's creditworthiness.

55. The lack of a CII reported makes it appear that a consumer has not addressed outstanding debt obligations through the bankruptcy process.

56. Furthermore, the lack of a CII reported suggests that creditors are free to collect against a consumer as an individual, or that no stay exists to prevent in personam collection activity.

57. Failure to report the correct CII indicator will prompt those making credit decisions to draw a more negative inference than if the appropriate CII indicator were reported.

58. The FCRA permits a bankruptcy to be reported for ten (10) years from the date the bankruptcy was filed.

59. A consumer's FICO Score is directly related to the date on which a petition is filed and acknowledged.

60. The bankruptcy's impact on a consumer's FICO Score lessens with the passage of time.

61. Accordingly, the failure to reference the bankruptcy filing (CII field) and/or the correct petition date results in a lower FICO Score, which in turn causes credit decision makers to draw a more negative inference regarding a consumer's creditworthiness.

**D.     Reaffirmation Agreements**

62. A reaffirmation agreement is a legally binding agreement between a debtor and a creditor that reaffirms the debtor's obligation to pay a debt that would otherwise have been discharged in the bankruptcy.

63. Pursuant to 11 U.S.C. § 524(c), an agreement is enforceable if: (1) it is made before the discharge is entered, (2) the debtor receives certain required disclosures at or before signing the agreement, (3) the agreement is filed with the court and, if applicable, includes a declaration by the debtor's attorney that the debtor was given certain advisements, (4) the debtor does not rescind the agreement, and (5) the agreement does not impose undue hardship upon the debtor.

64. A commonly used reaffirmation agreement is Form B 240A.[2]

65. Part V. of Form B 240A is titled, "Disclosure Statement and Instructions to Debtor(s)" which includes the following portion:

> 6. When will this reaffirmation agreement be effective?
>
> a. If you *were represented.*by an attorney during the negotiation of your reaffirmation agreement and
>
> i. if the creditor is not a Credit Union, your Reaffirmation Agreement becomes effective when it is filed with the court unless the reaffirmation is presumed to be an undue hardship. If the Reaffirmation Agreement is presumed to be an undue hardship, the court must review it and may set a hearing to determine whether you have rebutted the presumption of undue hardship.

66. 11 U.S.C. § 524(m)(1) states there is presumed undue hardship if the debtor's monthly income less monthly expenses is less than the scheduled payments for the reaffirmation agreement. The court must review this presumption. This presumption expires 60 days after the agreement is filed with the court.

**E.    Plaintiffs' Debt was Reaffirmed in their Bankruptcy**

67. Plaintiffs filed a voluntary petition for Chapter 7 bankruptcy on May 11, 2021 in order to repair their creditworthiness and individual Credit Scores.

68. Plaintiffs listed Capital One on Schedule D of their bankruptcy petition as a secured debt, and on the Debtor's Statement of Intentions showing their plan to execute a reaffirmation agreement.

69. On or about May 19, 2021, Plaintiffs executed a reaffirmation agreement, which matched the original terms of the prior agreement, and was filed with the court on May 24, 2021, by Capital One ("Reaffirmation Agreement").

---

[2] This form template can be found on most bankruptcy court's websites.

70. The Court entered an Order on the Reaffirmation Agreement stating that since the Reaffirmation Agreement was filed more than 60 days before the hearing, the presumption of undue hardship expired and 11 U.S.C. § 524(m)(1) does not apply to the agreement. Further, the Order points out that 11 U.S.C. § 524(c)(3) was satisfied.

71. As there was no presumption of undue hardship and all relevant requirements of 11 U.S.C. § 524(c) were satisfied, the Reaffirmation Agreement was effective upon its filing with the Court.

72. Plaintiff's bankruptcy was discharged on October 8, 2021.

**F.   Mr. Carpenter's Credit Reports Contain Inaccurate Adverse Tradelines, which Mr. Carpenter Disputed to no Avail**

73. On October 26, 2021, Mr. Carpenter ordered an Equifax credit report to ensure proper reporting by his creditors (the "October 26 Credit Report").

74. Mr. Carpenter noticed the adverse tradeline in his October 26 Credit Report, reporting inaccurate, misleading, or incomplete information that did not comply with the FCRA standards.

75. Mr. Carpenter then disputed the inaccurate tradelines regarding the account with Capital One via certified mail to Equifax on or about January 3, 2022 (the "First Dispute Letter").

76. The First Dispute Letter specifically put Capital One on notice that the account should not be listed as included or discharged in bankruptcy since the account was reaffirmed. Further, it stated the reaffirmed debt was recently paid in full and closed and the reporting should be updated.

77. The First Dispute Letter included a copy of the signed Reaffirmation Agreement along with copies of recent payments to support his contention that the account was not discharged and he continued to make payments until it was eventually sold and paid in full.

78. The First Dispute Letter also detailed what was perceived to be problematic about the Capital One account reporting, addressing the tradeline individually.

79. Mr. Carpenter requested that any derogatory reporting be updated to ensure accuracy and completeness of the account as required by the FCRA.

**G.     Mrs. Carpenter's Credit Reports Contain Inaccurate Adverse Tradelines, which Mrs. Carpenter Disputed to no Avail**

80.     On October 27, 2021, Mrs. Carpenter ordered an Equifax credit report to ensure proper reporting by her creditors (the "October 27 Credit Report").

81.     Mrs. Carpenter noticed adverse tradelines in her October 27 Credit Report, reporting inaccurate, misleading, or incomplete information that did not comply with the FCRA standards.

82.     Mrs. Carpenter then disputed the inaccurate tradeline regarding the account with Capital One via certified mail to Equifax on or about January 3, 2022 (the "Second Dispute Letter").

83.     The Second Dispute Letter specifically put Capital One on notice that the account should not be listed as included or discharged in bankruptcy since the account was reaffirmed. Further, it stated the reaffirmed debt was recently paid in full and closed and the reporting should be updated.

84.     The Second Dispute Letter included a copy of the signed Reaffirmation Agreement along with copies of recent payments to support her contention that the account was not discharged and she continued to make payments until it was eventually sold and paid in full.

85.     The Second Dispute Letter also detailed what was perceived to be problematic about the Capital One account reporting, addressing the tradeline individually.

86.     Mrs. Carpenter requested that any derogatory reporting be updated to ensure accuracy and completeness of the account as required by the FCRA.

**H.     Plaintiffs' First Complaint Against Capital One and Additional Disputes**

87.     On April 27, 2022, Plaintiffs' filed a complaint based upon the inaccurate reporting by Capital One as described therein. *See Jacob Carpenter, et al. v. Equifax Information Services, LLC, et al.,* Case No. 3:22-cv-00626-YY (D. Or. Filed Apr. 27, 2022).

88.     Capital One was a defendant in that complaint and was voluntarily dismissed without prejudice on August 17, 2022. *Id.* at Dkt. No. 25.

89.     Subsequent to the dismissal, Mr. Carpenter disputed the Capital One reporting on his Equifax credit report on or about August 24, 2022 (the "Third Dispute Letter").

90.     The Third Dispute Letter specifically placed Capital One on notice that the account was reaffirmed, not discharged in bankruptcy, and requested the account be properly updated.

91. Mr. Carpenter is informed and believes that Equifax sent Mr. Carpenter's dispute to Capital One, as the data furnisher, via an ACDV through e-OSCAR.

92. Subsequent to the dismissal, Mrs. Carpenter disputed the Capital One reporting on her Equifax credit report on or about August 24, 2022 (the "Fourth Dispute Letter").

93. The Fourth Dispute Letter specifically placed Capital One on notice that the account was reaffirmed, not discharged in bankruptcy, and requested the account be properly updated.

94. Mrs. Carpenter is informed and believes that Equifax sent Mrs. Carpenter's dispute to Capital One, as the data furnisher, via an ACDV through e-OSCAR.

   a. **Inaccuracy – Capital One**

95. Despite actual knowledge, Capital One continued to report Mr. Carpenter's account, beginning in 620627XXXXXXXXXX, to Equifax with a CII code of "E" to indicate the account was discharged in bankruptcy, inaccurate and incomplete payment history, and a comment of "Bankruptcy Chapter 7". This is patently incorrect as this account was reaffirmed, payments were made, and it was not discharged in his bankruptcy.

96. Despite actual knowledge, Capital One continued to report Mrs. Carpenter's account, beginning in 620627XXXXXXXXXX, to Equifax with a CII code of "E" to indicate the account was discharged in bankruptcy, inaccurate and incomplete payment history, and a comment of "Bankruptcy Chapter 7". This is patently incorrect as this account was reaffirmed, payments were made, and it was not discharged in her bankruptcy.

97. Reporting a reaffirmed and paid in full debt as discharged in bankruptcy is patently incorrect. Reporting no payment history or reporting a "-" for "data unavailable" when payments have been made is patently incorrect. In addition, these inaccurate and incomplete tradelines are misleading in a way that can adversely affect credit decisions.

98. Plaintiffs allege that Capital One did not investigate whether the account was reaffirmed, or whether the Plaintiffs had been making payments since filing their Reaffirmation Agreement.

99. Equifax, on at least two occasions, provided notice to Capital One that the Plaintiffs were disputing the inaccurate and misleading information, but Capital One failed to conduct a reasonable investigation of the information as required by the FCRA.

100. Based on Plaintiffs' multiple disputes, original lawsuit, additional disputes, the provided payment verification, the Reaffirmation Agreement (which Capital One signed and filed in the bankruptcy court), along with its own internal records, Capital One should have known that Plaintiffs' account was not discharged due to the Reaffirmation Agreement, that the has maintained a positive payment history which was not being reported.

101. The most basic investigation would include a simple review of internal documentation on the account compared to its reporting in order to determine if it complies with the maximum possible accuracy and completeness standard of the FCRA.

102. Plaintiffs allege that Capital One did not review if its reporting complied with the FCRA or industry standards for credit reporting, the disputes it received from Equifax, or its own internal records concerning Plaintiffs' account.

103. If Capital One reviewed such standards and records, Capital One would have seen that its reporting was not in compliance and was therefore inaccurate or incomplete. At the very least, the investigation would reveal that payments were being made on the account, and therefore, those payments should be reported.

104. Capital One should have reported the CII Code as "R" and updated the account to accurately report all the payments made on the account.

105. By continuing to report Plaintiffs' account as described hereinabove, it incorrectly appears to third parties viewing either of Plaintiff's credit reports that they stopped paying the account, have not made payments in months or at all, and that the account was discharged in their bankruptcy. This makes Defendant's reporting misleading.

106. Further, as this inaccurate reporting is being used to calculate each of Plaintiff's Credit Scores, the credit scores alone being what most lenders use to determine Plaintiffs' creditworthiness, it is misleading in such a way as to adversely affect credit decisions.

107. A discharged debt is treated far more derogatorily by a potential lender than one which was reaffirmed and reflects a consumer's ability to make payments month after month, year after year.

108. As payment history makes up thirty-five percent (35%) of a consumer's credit score, and as most lenders approve or deny credit based on a consumer's credit score (as opposed to poring through each tradeline of every account listed to obtain context), the incorrect payment history reported by Capital One is lowering each Plaintiff's respective Credit Score, which adversely affects their ability to obtain credit.

109. Further, even if a lender did look through the tradelines, based upon Capital One's reporting, it appears as if the Plaintiffs have not made payments on this account and that it was discharged in bankruptcy; both of which are inaccurate.

110. The lack of investigation and reporting of inaccurate and incomplete information by Capital One is unreasonable.

I.     **Damages**

111. Plaintiffs pulled their credit reports at issue at a cost for access to the reports, after the dispute process, specifically for the sole purpose of verifying that the inaccuracies were fixed.

112. As a result of the incorrect reporting, Plaintiffs have incurred out-of-pocket expenses, and have also suffered emotional harm, physical sickness, and excessive stress resulting in doubt as to the effectiveness of the Fair Credit Reporting Act and the power of this Court to preserve and perpetuate Plaintiffs' rights to accurate credit reporting as intended by Congress.

113. Plaintiffs are unable to rebuild their credit based on the inaccurate reporting by Capital One. Further, Plaintiffs' diminished creditworthiness, resulting from Capital One's inaccurate reporting, have caused them both to abandon their intentions to apply for certain credit.

114. Capital One's patently incorrect and misleading reporting has been published to multiple creditors.

115. Due to Capital One's inaccurate reporting of Plaintiffs' loan, they decided to sell the vehicle since they were not getting credit on the payments they were making. The new vehicle purchase caused Plaintiffs' to incur a higher interest rate, higher monthly payments, and loss of enjoyment of their original vehicle.

116. Capital One's actions, as alleged herein, are in direct violation of the Fair Credit Reporting Act, 15 U.S.C. § 1681s-2(b).

## FIRST CAUSE OF ACTION

### (Violation of Fair Credit Reporting Act 15 U.S.C. § 1681s-2(b))

### (Against Defendants and Does 1-100)

117. Plaintiffs re-allege and incorporate the allegations in each and every paragraph above by reference as if fully stated herein.

**A.      Capital One Failed to Reinvestigate Following Plaintiffs' Multiple Disputes**

118. Pursuant to 15 U.S.C. § 1681s-2(b), data furnishers are prohibited from providing any information relating to a consumer to any CRA if it knows, or has reasonable cause to believe, that the information is inaccurate or misleading and requires data furnishers to update and/or correct inaccurate information after a CRA notifies it of a consumer dispute.

119. Capital One sent an AUD or monthly transmission to Equifax reporting Mr. Carpenter's account as discharged in bankruptcy, the account status as closed, the balance as zero, and no monthly payment. The AUD or monthly transmission Capital One sent to Equifax deleted the entire payment history on the account.

120. The bankruptcy petition included Mr. Carpenter's notice of intent to reaffirm the debt. Even after Mr. Carpenter and Capital One executed the Reaffirmation Agreement and it was filed with the court, Capital One continued to report the debt as discharged in bankruptcy to Equifax.

121. After execution of the Reaffirmation Agreement, Capital One did not report the debt as "reaffirmed", but instead continued to report it as included and discharged in bankruptcy.

122. After execution of the Reaffirmation Agreement, Mr. Carpenter was making payments, yet Capital One was misreporting those payments to Equifax.

123. After receiving the disputes, Capital One did not correct the bankruptcy reporting on the Equifax credit report. Instead, Capital One verified and re-reported the inaccurate discharged in bankruptcy notations via ACDV to Equifax.

124. Capital One sent an AUD or monthly transmission to Equifax reporting Mrs. Carpenter's account as discharged in bankruptcy, the account status as closed, the balance as zero, and no monthly payment. The AUD or monthly transmission Capital One sent to Equifax deleted the entire payment history on the account.

125. The bankruptcy petition included Mrs. Carpenter's notice of intent to reaffirm the debt. Even after Mrs. Carpenter and Capital One executed the Reaffirmation Agreement and it was filed with the court, Capital One continued to report the debt as discharged in bankruptcy to Equifax.

126. After execution of the Reaffirmation Agreement, Capital One did not report the debt as "reaffirmed", but instead continued to report it as included and discharged in bankruptcy.

127. After execution of the Reaffirmation Agreement, Mrs. Carpenter was making payments, yet Capital One was misreporting those payments to Equifax.

128. After receiving the disputes, Capital One did not correct the bankruptcy reporting on the Equifax credit report. Instead, Capital One verified and re-reported the inaccurate discharged in bankruptcy notations via ACDV to Equifax.

129. Once the account was reaffirmed, the account should be reported to reflect the current liability on the account, current ongoing payment terms, and actual payment history. Not doing so makes the reporting patently incorrect and very likely to mislead a credit reviewer of the consumer's performance and liability on the debt.

130. Capital One violated 15 U.S.C. § 1681s-2(b) by either failing to conduct an investigation or failing to conduct a reasonable investigation, and re-reporting misleading and inaccurate account information.

131. Capital One was required to conduct a reasonable investigation pursuant to each received dispute. Thus, Capital One has violated 15 U.S.C. § 1681s-2(b) multiple times.

132. Equifax provided notice to Capital One that Plaintiffs were disputing the inaccurate and misleading information; however, Capital One failed to conduct a reasonable investigation as required by the FCRA.

133. Based on the Plaintiffs' disputes, along with a review of its own internal records, Capital One should have known its account was reaffirmed and paid. Further, Capital One should have reported the full payment history as it has actual knowledge of the payments made from the reaffirmation agreement until the debt was paid in full.

134. Since Capital One has already decided to report the account, as evidenced by it showing up on Mr. Carpenter's credit reports and Mrs. Carpenter's credit reports, once it received the disputes, it had a duty to review all relevant information, and update any incorrect or inaccurate information to Equifax.

135. Inaccurate information includes not only the information reported, such as reporting a reaffirmed debt as discharged, but also for omissions that render the reported information misleading, such as reporting "-" or "D" when an actual payment was made.

136. Reporting an account which was reaffirmed with positive payment history as discharged in bankruptcy and wholly without or with incomplete payment history is patently incorrect.

137. Discharged debts are much more detrimental to a credit score than a reaffirmed debt, paid on time, and in good standing. In addition, this inaccurate reporting also adversely affects credit decisions. This inaccurately reported account is being considered when calculating each of Plaintiff's Credit Scores. Most lenders, employers, and other individuals who access a consumer's credit report approve or deny credit or employment based upon the reported credit score and do not take the time to look through each tradeline of every account listed to obtain context. Therefore, Capital One's reporting as described herein has a direct adverse effect on each Plaintiff's Credit Score and their ability to rebuild their respective Credit Scores and obtain new credit.

138. The lack of investigation by Capital One, as required by the FCRA, is unreasonable.

**B.     Willful Violations**

139. Plaintiffs allege that Capital One has reported based upon objectively unreasonable interpretations of the FCRA standards of credit reporting and regulatory guidelines on how to accurately report under the FCRA.

140. Plaintiffs further allege that Capital One has not properly trained those directly investigating disputes on FCRA requirements or credit reporting industry standards and, as such, have developed reckless policies and procedures.

141. Plaintiffs allege that rather than train its employees on accurate credit reporting, FCRA requirements, and industry standards, Capital One's employees tasked with reviewing disputes are expected to confirm the information being reported as "accurate" instead of investigating the reported information.

142. As Plaintiffs executed the Reaffirmation Agreement, they each retain personal liability on the loan, and it was not discharged in their bankruptcy. Capital One had actual knowledge of the bankruptcy and Reaffirmation Agreement (which it executed and filed with the bankruptcy court), along with Plaintiffs' intent to retain their motor vehicle and continue to pay

their debt. Capital One continued to accept Plaintiffs' payments each month until the account was paid in full. Capital One was served a copy of the original complaint and its counsel discussed the details of the inaccurate reporting at length with Plaintiffs' counsel. After receiving additional disputes, Capital One continued to report incorrectly. All of this evidence, taken together, establishes Capital One's willfulness in its inaccurate and incomplete reporting.

143. In the alternative, Capital One was negligent, which entitles each Plaintiff to recover under 15 U.S.C. § 1681o.

## PRAYER FOR RELIEF

144. WHEREFORE, Plaintiffs pray for judgment as follows:

a. For preliminary and permanent injunctive relief to stop Defendants from engaging in the conduct described above;

b. Award statutory and actual damages pursuant to 15 U.S.C. § 1681n;

c. Award punitive damages in order to deter further unlawful conduct pursuant to 15 U.S.C. § 1681n;

d. Award attorneys' fees and costs of suit incurred herein pursuant to 15 U.S.C. §§ 1681n and 1681o;

e. For determination by the Court that Defendant's policies and practices are unlawful and in willful violation of 15 U.S.C. § 1681n, *et seq*.; and

f. For determination by the Court that Defendant's policies and practices are unlawful and in negligent violation of 15 U.S.C. § 1681o.

Respectfully submitted,

**SCHUMACHER LANE PLLC**

Dated: January 31, 2023

*/s/ Kyle Schumacher*
Kyle Schumacher
Attorneys for Plaintiffs

## **DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand trial of this matter by jury.

**SCHUMACHER LANE PLLC**

Dated: January 31, 2023

*/s/ Kyle Schumacher*
Kyle Schumacher
Attorneys for Plaintiffs